**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| Rene Goguen, individually and | ) | Case No._____ |
| on behalf of all others similarly situated; | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WORLD WRESTLING | ) | |
| ENTERTAINMENT , INC., | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| Defendant. | ) | |

**CLASS ACTION COMPLAINT**

Plaintiff Rene Goguen, individually and on behalf of all others similarly situated, allege

as and for their Class Action Complaint against defendant World Wrestling Entertainment, Inc.

("WWE")( "Defendant"), upon personal knowledge as to himself and his own acts, and as to all

other matters upon information and belief, based upon *inter alia*, the investigation made by his

attorneys, as follows:

## I.     NATURE OF THE ACTION

1.     Plaintiff Rene Goguen ("Plaintiff") brings this action on behalf of himself and all

similarly situated individuals who have not received contractually owed royalty payments from

World Wrestling Entertainment ("WWE") for certain content that has been sold or licensed by

the WWE on the World Wrestling Entertainment Network ("WWE Network") and on Netflix.

## II.     JURISDICTION AND VENUE

1

2.      This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), which provides for the original jurisdiction of the Federal Courts for any class action in which any member of the plaintiff class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000.00, exclusive of interest and costs.

3.      Plaintiff alleges that the total claims of the individual members of the Plaintiff Class in this action are in excess of $5,000,000.00 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. §1332 (d)(2), (5).  As set forth above and below, Plaintiff is a citizen of New Brunswick, Canada.  WWE is a Delaware corporation, headquartered in Stamford, Connecticut.  Diversity of citizenship exists under CAFA and supports subject matter jurisdiction under 28 U.S.C § 1332 (a)(1), (d)(2)(A).  More than two-thirds of all the members of the proposed Plaintiff Class in the aggregate are citizens of a state other than Connecticut, where this action is originally being filed, and the total number of members of the proposed Plaintiff Class is greater than 100, pursuant to 28 U.S.C. §1332 (d)(5)(B).

4.      <u>Personal Jurisdiction Over Defendant.</u> This Court has personal jurisdiction over Defendant pursuant to Defendant's Booking Contract, from which the parties consent to personal jurisdiction in Connecticut for purposes of seeking legal relief arising from the booking contract.

5.      <u>Venue</u>. Venue is proper pursuant to Defendant's booking contract, as the Defendant consented to any Federal or state court in Connecticut as appropriate venue for purposes of Plaintiff seeking legal relief arising from Plaintiff's booking contract.

### III.    Parties

6.      Plaintiff is a citizen of New Brunswick, Canada.  He was employed by Defendant as a professional wrestler from May 2003 to July 2007.

7.     Defendant World Wrestling Entertainment, Inc. ("WWE") is a Delaware corporation with a principal place of 1241 East Main Street, Stamford, Connecticut.  At all material times, WWE has organized, operated and promoted entertainment featuring professional wrestling personalities under the name "World Wrestling Entertainment."  WWE is the successor to Titan Sports, Inc. ("Titan").

## IV.    FACTUAL ALLEGATIONS

<u>THE PARTIES' CONTRACT</u>

8.     Plaintiff is a highly successful professional wrestler and entertainer, having performed around the world for the past 15 years.

9.     Defendant WWE is a publically traded entertainment company that deals primarily in professional wrestling.  Since its incorporation in 1980, WWE has acquired other professional wrestling promotion's trademarks, tape libraries, contracts and other properties, including World Championship Wrestling ("WCW") and Extreme Championship Wrestling ("ECW").

10.     On May 26, 2003, Plaintiff signed as a professional wrestler with the WWE to perform under the ring name of "Rene Dupree" and the group "La Resistance", and the WWE agreed to act as his promoter ("Booking Contract").  *See* **EXHIBIT 1**.

11.     James Ross signed the Booking Contract on behalf of World Wrestling Entertainment, Inc.

12.     Under Section 3.1 of the Booking Contract, Plaintiff and WWE agreed that "Original Intellectual Property" includes:

All service marks, trademarks and any and all other distinctive and identifying indicia under which WRESTLER claims any rights, including but not limited to WRESTLER's legal name, nickname, ring name, likeness, personality, character, caricatures, voice, signature, costumes, props, gimmicks, gestures, routines and

3

themes, which are owned by WRESTLER or in which WRESTLER has any rights anywhere in the world.

13.     WWE and Plaintiff agreed that WWE, subject to its obligation to make certain royalty payments, has exclusive rights to "New Intellectual Property," defined under the Booking Contract at Section 3.2(a)(i) as:

> With the exception of the Original Intellectual Property, service marks, trademarks and/or distinctive and identifying indicia, including ring name, nickname, likeness, personality, character, caricatures, voice, signature, props, gestures, routines, themes, incidents, dialogue, actions, gags, costumes or parts of costumes, accessories, crowns, inventions, championship, title or other belts (if applicable), and any other items of tangible or intangible property written, composed, submitted, added, improvised, created and/or used by or associated with WRESTLER's performance in the business of professional wrestling or sports entertainment during the Term of this Agreement (collectively, the "New Intellectual Property") are hereby assigned to and shall belong to PROMOTER, in perpetuity, with PROMOTER retaining all such ownership rights exclusively throughout the world notwithstanding any termination of this Agreement

14.     Under Section 7.3 of the Booking Contract, WWE is obligated to pay Plaintiff twenty five percent (25%) of Licensed Product Royalties when:

> Original and/or New Intellectual Property of Plaintiff (Plaintiff assigned to WWE in exchange for royalty payments) are used by WWE and/or licensed, sublicensed, or otherwise assigned to third parties for production, reproduction and/or sale and distribution in connection with any consumer materials, goods or merchandise (hereinafter collectively referred to as "Licensed Products") featuring Plaintiff with other wrestlers represented by WWE, WWE shall allocate 25% of the Licensed Products Net Receipts, to be paid pro-rata among Plaintiff and all other talent so featured.

15.     Per section 7.3(a) of the Booking Contract, Licensed Products Net Receipts means the gross amount received by WWE, less expenses incurred by WWE or its licensing agent for the applicable Licensed Product.

16.     Under Section 7.5 (a)(i) of the Booking Contract, WWE is also obligated to pay Plaintiff Royalties for Pay-Per-View Videos Sold By Licensees under the following circumstances:

4

WWE shall allocate 25% of the Net Receipts paid to WWE by licensees authorized to reproduce and sell video cassettes, videodiscs, CD ROM, or *other technology, including technology not yet created* (hereinafter referred to as "WWE Video Products"), of WWE Pay-Per-Views in their entirety ("WWE Pay-Per-Views") to a talent royalty pool.  Thereafter, WWE shall pro-rate payment to Plaintiff and all other talent appearing in such WWE Pay-Per-Views in the same proportion as was the compensation paid to Plaintiff for his appearances in the pay-per-views to the total amount paid to all talent for their appearances in the pay-per-view.

17.      Under Section 7.5 (a)(ii) of Plaintiff's Booking Contract, WWE is also obligated

to pay Royalties for Pay-Per-View Videos Sold By Licensees when:

WWE Video Products are a compilation or derivative work of multiple individual WWF Pay-Per-Views in their entirety, such as a collection of videos, e.g., a WrestleMania box set, payment to Plaintiff shall be calculated as follows: 25% of the Net Receipts paid to WWE by licensees shall comprise the talent royalty pool, which shall first be pro-rated based on the number of individual videos in the compilation, and then the payment to Plaintiff for each video shall be consistent with the royalty payment to the Plaintiff at the time that each individual video was first released.

18.      For Section 7.5(a) calculations, Net Receipts means the gross amount received by

WWE from the licensees for the WWE Pay-Per-Views less any and all costs incurred by WWE

to produce and/or distribute such WWE Pay-Per-Views.

19.      Under Section 7.5 (b) of Plaintiff's Booking Contract, WWE is obligated to pay

Royalties for Non-Pay-Per-View Videos Sold by Licensees under the following circumstances:

WWE shall allocate 25% of the Net Receipts paid to WWE by licensees authorized to reproduce and sell all other WWF Video Products, other than those set forth in 7.5 (a)(i) and (a)(ii) above, to a talent royalty pool, from which WWE shall pay Plaintiff and all other talent appearing in such WWE Video Products pro-rata among Plaintiff and all other talent so featured.

20.      For Section 7.5 (b) calculations, Net Receipts means the gross amount received by

WWE for the WWE Video Products less any and all costs incurred by WWE to produce and/or

distribute such WWE Video Products.

21.     Under Section 7.5(c)(i) of Plaintiff's Booking Contract, WWE is also obligated to

pay Royalties for Pay-Per-View Videos Sold by WWE under the following circumstances:

> WWE shall allocate 5% of the Net Receipts paid to WWE with respect to the
> direct sale by WWE of WWE Pay-Per-Views to a talent royalty pool.  Thereafter,
> WWE shall pro-rate payment to Plaintiff and all other talent appearing in such
> WWE Pay-Per-Views in the same proportion as was the compensation paid to
> Plaintiff for his appearances in the pay-per-views to the total amount paid to all
> talent for their appearances on the pay-per-views.

22.     Under 7.5 (c)(ii) of Plaintiff's Booking Contract, WWE is obligated to pay

Royalties for Pay-Per-View Videos Sold by WWE when:

> The WWE Video Product is a compilation or derivative work of multiple
> individual WWE Pay-Per-Views in their entirety, such as a collection of videos,
> e.g., a WrestleMania box set, payment to Plaintiff shall be calculated as follows:
> 5% of the Net Receipts paid to WWE shall comprise the talent royalty pool,
> which shall first be pro-rated based on the number of individual videos in the
> compilation, and then the payment to Plaintiff for each video shall be consistent
> with the royalty payment to the Plaintiff at the time each individual video was
> first released.

23.     For 7.5 (c)(i) and (c)(ii) calculations, Net Receipts means the gross amount

received by WWE for the WWE Pay-Per-Views.

24.      Under 7.5 (d) of Plaintiff's Booking Contract, WWE is also obligated to pay

Plaintiff Royalties for Non Pay-Per-View Videos Sold by WWE under the following

circumstances:

> WWE shall allocate 5% of the Net Receipts paid to WWE with respect to the
> direct sale by Plaintiff of all other WWE Video Products other than those set forth
> in 7.5 (c)(i) and (c)(ii) above, to a talent royalty pool, from which WWE shall pay
> Plaintiff and all other talent appearing in such WWE Video Products pro-rata
> among Plaintiff and all other talent so featured.

25.     For 7.5 (d) calculations, Net Receipts means:

> The gross amount received by WWE for the WWE Video Products.
> Notwithstanding the foregoing, if Plaintiff is deemed to be the "featured
> performer" as determined by WWE in its sole discretion, Plaintiff shall receive a
> bonus of an additional 5% of WWE's Net Receipts up to the sale of the first

150,000 units.  Once sales exceed 150,000, Plaintiff as a featured performer shall receive 10% of WWE's Net Receipts on all units sold, including the first 150,000 units.  If Plaintiff is part of a group that is determined to be the "featured performer," Plaintiff shall share pro-rata with each and every member of the group in any bonus monies that may be due in connection with such WWE Video Products.

26.     The definition of WWE Video Products under Section 7.5 (a) is, "video cassettes, videodiscs, CD ROM, or *other technology, including technology not yet created*," which includes streaming videos on the World Wrestling Entertainment Network ("WWE Network") and streaming videos on Netflix because under Section 7.5 (a) both were "*other technology and/or technology not yet created*" at the time Plaintiff signed the Booking Contract.  *See* **EXHIBIT 2** (Definition of WWE Video Products in Plaintiff's Booking Contract).

27.     The definition of Pay-Per-View Videos ("PPVs") under Section 7.5 (a) is, "WWE Pay-Per-Views in their entirety."  *See* **EXHIBIT 3** (Definition of WWE Pay-Per-Views in Plaintiff's Booking Contract).

28.     The definition of Non-Pay-Per-View Videos ("Non-PPVs") under Section 7.5 (b) and 7.5 (d) is, "all other WWE Video Products, other than WWE Pay-Per-Views in their entirety and a compilation or derivative work of multiple individual WWE Pay-Per-Views in their entirety."  *See* **EXHIBIT 4** (Definition of Non Pay-Per-View Videos in Plaintiff's Booking Contract).

29.     For several years, WWE has sold WWE Video Products (streaming videos on WWE Network) of Pay-Per-View Videos ("PPVs")/ Non-Pay-Per-View Videos ("Non-PPVs") without paying royalties to Plaintiff.

30.     Additionally, a WWE licensee, Netflix, has sold WWE Video Products (streaming videos) of PPVs/ Non-PPVs, without WWE paying royalties to Plaintiff.

31.     WWE breached its contract with Plaintiff by not paying royalties from the above mentioned sales of WWE Video Products.

## WWE NETWORK

32.     World Wrestling Entertainment Network ("WWE Network") is a 24/7 direct to consumer video streaming network (like a Netflix of WWE content), created, owned, and sold by WWE that was launched Monday, February 24, 2014.

33.     Because streaming video content and videos on demand on the WWE Network was "*other technology and/or technology not yet created*" at the time Plaintiff signed the Booking Contract, streaming videos on the WWE Network is within the definition of WWE Video Products under Section 7.5 (a) of Plaintiff's Booking Contract, "video cassettes, videodiscs, CD ROM, or *other technology, including technology not yet created*" (*emphasis added*).  *See* **EXHIBIT 2** (Definition of WWE Video Products in Plaintiff's Booking Contract).

34.     WWE sells the WWE Network for $9.99 per month and is available in more than 180 countries and territories.

35.     The streaming video content of the WWE Network consists of all 12 WWE live monthly pay-per-view events, reality shows, documentaries (Non-PPV sold by WWE), past pay-per-view events (PPV sold by WWE), and classic wrestling matches (Non-PPV sold by WWE).

36.     WWE Network averaged 1,237,000 purchases per month during the fourth quarter of 2015, and for the full year of 2015, WWE Network purchasers watched an estimated total of 256 million hours of content, representing an average of 188 hours per household.  *See* **EXHIBIT 5** (WWE's Fourth-Quarter 2015 Press Release at pages 1-2).

37.     Defendant breached its Booking Contract with Plaintiff by selling WWE Video Products (streaming videos on the WWE Network) of PPVs and Non-PPVs without paying any

royalties to Plaintiff.  Plaintiff assigned his intellectual property rights in perpetuity to WWE in exchange for royalty payments from the sales of WWE Video Products of PPVs and Non-PPVs.

NETFLIX

38.    Netflix is a direct to consumer video streaming service (like WWE Network) that licenses videos from copyright holders and sells to Netflix customers for $8.99 a month.

39.    Because streaming video content was "*other technology and/or technology not yet created*" at the time Plaintiff signed the Booking Contract, streaming videos through Netflix is within the definition of WWE Video Products under Section 7.5 (a) of Plaintiff's Booking Contract, "video cassettes, videodiscs, CD ROM, or *other technology, including technology not yet created*" (*emphasis added*).  *See* **EXHIBIT 2** (Definition of WWE Video Products in Plaintiff's Booking Contract).

40.    WWE Video Products (streaming video) of past pay per view videos (PPVs sold by licensee) and documentaries (Non-PPVs sold by licensee) were sold by licensee Netflix from at least 2012 until January 2015.

41.    Defendant breached its Booking Contract with Plaintiff by licensing WWE Video Products (streaming video) of PPVs and Non PPVs without paying any royalties to Plaintiff.

**V.    CLASS ACTION ALLEGATIONS**

42.    Plaintiff brings this action for himself, and on behalf of all others similarly situated.  The Class and Subclasses that Plaintiff seeks to represent are defined as follows:

> All individuals who have assigned their original and new intellectual property rights to WWE or a promotion that WWE has acquired the assets and/or the video library of, in exchange for perpetual royalty payments from WWE's (or acquired promotion) or licensees' sales of past pay-per-view events or non pay-per-view productions.  The class is further defined by the following two Subclasses of former employees:

> a)    WWE Performer Subclass

9

All performers of WWE employed any time from February 21, 1980 until the date of filing, as full-time or part-time, as follows:

<u>For the signing period of February 21, 1980 until January 1, 1992</u>:

- All persons who signed a WWE Booking Contract when the definition of WWE Video Products was, "videocassettes or discs which feature him/ her exclusively."

<u>For the signing period of January 1, 1992 until January 1, 1999,</u>

- All persons who signed a WWE Booking Contract when the definition of WWE Video Products was, "video programs."

<u>For the signing period of January 1, 1999 until January 1, 2004</u>

- All persons who signed a WWE Booking Contract when the definition of WWE Video Products was, "video cassettes, videodiscs, CD ROM, or other technology, including technology not yet created."

<u>For the signing period of January 1, 2004 until January 1, 2012</u>

- All persons who signed a WWE Booking Contract when the definition of WWE Video Products was, "DVD/Home Video."

<u>For the signing period of January 1, 2012 to date of filing</u>

- All persons who signed a WWE Booking Contract when the definition of WWE Video Products was/is "product sale- the sale of any WWE authorized product, merchandise, consumer material or good, which is made by or on behalf of WWE."

b)    <u>WWE ACQUIRED PROMOTIONS</u>

10

All performers of WWE acquired promotions as follows:

Extreme Championship Wrestling (ECW)

- All persons who signed a Booking Contract with ECW between 1994-2001, where the persons assigned their intellectual property rights in perpetuity to ECW in exchange for royalty payments from the media sales of past Pay-Per-View Events and Non Pay-Per-View Productions.

World Championship Wrestling (WCW)

- All persons who signed a Booking Contract with WCW between 1988-2001, where the persons assigned their intellectual property rights in perpetuity to WCW in exchange for royalty payments from the media sales of past Pay-Per-View Events and Non Pay-Per-View Productions.

All other WWE Acquired Promotions

- All persons who signed a Booking Contract with WWE acquired promotions other than ECW and WCW between 1970 and the date of filing, where the persons assigned their intellectual property rights in perpetuity to "their promoter" in exchange for royalty payments from the media sales of past Pay-Per-View Events and Non Pay-Per-View Productions.

43.     Plaintiff reserves the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.  Excluded from the Class are Defendant; its officers and directors; any entity in which

11

Defendant has a controlling interest; the affiliates, legal representatives, attorneys, heirs, and assigns of Defendant; any federal, state or local government entity; and any judge, justice or judicial officer presiding over this matter and the members of their immediate families and judicial staffs.

44.   **Numerosity.**   Plaintiff does not know the exact size or identities of the members of the proposed Class and subclasses, since such information is in the exclusive control of the Defendant.  Plaintiff believes that the Class and Subclasses encompasses hundreds, possibly thousands, of individuals whose identities and royalties owed can be readily ascertained from Defendants' books and records.  Accordingly, the members of the Class and Subclasses are so numerous that their individual joinder would be impracticable.

45.   **Commonality.**   There are numerous questions of law and fact that are common to the Plaintiff and all members of the Class and Subclasses, including, but not limited to the following:

> a) Whether Defendant breached its Booking Contract duties;
>
> b) Whether Plaintiff and Class members have suffered damages;
>
> c) Whether Plaintiff and Class members are entitled to punitive damages;
>
> d) Whether Plaintiff and Class members are entitled to equitable relief;
>
> e) Whether Plaintiff and Class members are entitled to injunctive relief.

46.   **Typicality.**   Plaintiff is a member of the Class and has claims that are typical of all members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendant and may be remedied under the same legal theories.

47.    **Adequacy.**  Plaintiff will fairly and adequately represent the interest of the members of the Class and Subclasses.  Plaintiff has no conflicts of interest with, or interest, that are any different from those of the other class members.  Plaintiff has retained competent counsel experienced in class action and other complex litigation.

48.    **Predominance.**  Common questions of law and fact predominate over questions affecting only individual class members, as class members, whose terms are substantially the same, having no individual issues other than calculating each member's royalty amount by an identical formula.

49.    **Superiority.**  A class action is superior to all other feasible alternatives for the resolution of this matter.  Individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the court and of the parties, and potentially could lead to inconsistent results that would be contrary to the interest of justice.  Absent a class action, it would be highly unlikely that the representative Plaintiff or any other members of the Class or any Subclass would be able to protect their own interest because the cost of litigation through individual lawsuits would exceed expected recovery.

50.    **Manageability.**  This case is well suited for treatment as a class action and can easily be managed as a class action because evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a class-wide basis, while the allocation and distribution of damages to class members would be essentially a ministerial function.

51.    Defendant has acted on grounds generally applicable to Plaintiff and the Class' and Subclasses' members through breach of contract.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with

corresponding declaratory relief and punitive damages are appropriate with respect to the Class

and Subclasses as a whole.

## VI. CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT—FAILURE TO PAY ROYALTIES

52.     Plaintiff repeats and re-alleges every allegation above as if set forth herein in full.

53.     Plaintiff brings this claim on his own behalf and on behalf of each member of the

Class and Subclasses.

54.     Plaintiff and members of the Class and Subclasses formed binding and

enforceable contracts when they executed written WWE Booking Contracts.

55.     Under Section 7.5 of Plaintiff's Booking Contract, Plaintiff and members of the

Class and Subclasses are entitled to royalties from WWE's and licensees' sales of WWE Video

Products (streaming video) containing Plaintiff in Pay-Per-Views and Non Pay-Per-Views.  *See*

**EXHIBIT 2** (Definition of WWE Video Products in Plaintiff's Booking Contract).

56.     WWE has not paid Plaintiff and members of the Class and Subclasses any

royalties from WWE's and Netflix's (licensee) sales of WWE Video Products (streaming video)

of Pay-Per-Views and Non Pay-Per-Views.

57.     Plaintiff and members of the Class and Subclasses have been damaged by WWE's

breach of the obligation to pay royalties to Plaintiff and members of the Class and Subclasses.

### SECOND CAUSE OF ACTION

### (BREACH OF FIDUCIARY DUTY)

### (Against All Defendants)

58.     Plaintiff incorporates by reference each and every prior and subsequent allegation as though fully set forth at this point.

59.     In agreeing to allow Defendant to serve at its Promotor, Plaintiff and each member of a Plaintiff class placed a unique degree of trust and confidence in the Defendant, who clearly had superior knowledge, skill or expertise in managing such affairs and were under a duty to represent the interests of Plaintiff and each member of a Plaintiff class as his Promotor.

60.     Defendant's role as his Promotor placed it in a dominant position, thereby creating a relationship of dependency.

61.     Defendant placed itself in the role of Trustee of royalties due Plaintiff and each member of a Plaintiff class, who depended and continues to depend on Defendant's integrity and good faith in honoring the royalty obligation and properly accounting to Plaintiff and each member of a Plaintiff class all amounts justly due.

62.     Defendant has advanced its interests to the detriment of the Plaintiff and each member of a Plaintiff class by failing to properly pay royalties as described above.

63.     As a result therefrom, Plaintiff and each member of a Plaintiff class has sustained damages.

### THIRD CAUSE OF ACTION

#### (UNJUST ENRICHMENT/RESTITUTION)

#### (Against All Defendants)

64. Plaintiff incorporates by reference each and every prior and subsequent allegation as though fully set forth at this point.

65. Defendant has, in violation of its clear obligation, engaged in a massive and profitable scheme, pattern and/or practice of intentionally underpaying required royalties,

expressly designed to enrich Defendants at the expense of the Plaintiff and the class he brings this claim on behalf of.

66. The Defendant has obtained substantial benefit as a direct result of its violation of the rights of the Plaintiff and members of the Plaintiff class, which it in equity and good conscience ought not be able to keep.

## THIRD CAUSE OF ACTION

### (VIOLATION OF THE CONNECTICUT UNFAIR TRADE PRACTICES ACT, C.G.S. §42-110A, *ET SEQ.*)

### (Against All Defendants)

67. Plaintiffs incorporate by reference each and every prior and subsequent allegation as though fully set forth at this point.

68. Defendant has acted in bad faith and in breach of fiduciary duties owed to Plaintiff and members of the Plaintiff class by failing to account for millions of dollars in owed royalties.

69.  Defendant has repeatedly misrepresented to Plaintiff and each member of a Plaintiff class the amounts rightfully owed to them.

70.  Said conduct is a violation of the Connecticut Unfair Trade Practices Act, C.G.S. §42-110a, *et seq.* on the part of the Defendant in that said actions in the course of the Defendant's trade or business were immoral, oppressive, unscrupulous, and caused substantial injury to the Plaintiffs.

71. The Defendant's conduct caused substantial ascertainable loss to the Plaintiff and members of the Plaintiff class, including but not limited to the loss of valuable

16

royalties and the information necessary to determine the amounts properly due to

Plaintiff.

72. Additionally, the Defendant obtained substantial benefit as a direct result of its

invasion of the privacy of the Plaintiff and members of the Plaintiffs class, which

in equity and good conscience ought not be able to keep.

73. A copy of this complaint has been mailed to the Attorney General of the State of

Connecticut and the Commissioner of Consumer Protection.

## VII.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, individually and on behalf of the Class and Subclasses of

persons described herein, pray for an Order as follows

Plaintiff, on behalf of himself and members of the Class and Subclasses,

respectfully requests that this Court:

a) Certify the Class and Subclasses as requested herein, appoint Plaintiff as Class

Representative and his selection of counsel as lead Class Counsel, and order

class-wide relief;

b) Adjudge and decree that Defendant has engaged in the conduct alleged herein;

c) Enjoin and restrain Defendant and its officers and agents from continuing or

engaging in similar conduct as alleged herein;

d) Enjoin and restrain Defendant from placing Pay-Per-Views and Non Pay-Per-Views on the WWE Network until WWE pays Plaintiff's and the Class' and Subclass' royalty payments.

e) Imposing a constructive trust on amounts wrongfully withheld from Plaintiff and the Class and Subclasses members pending resolution of their claims herein;

f) Order that Defendant pay restitution to Plaintiff and the Class and Subclasses which would restore Plaintiff and the Class and Subclasses to the financial position they would have been in absent Defendant's breach of contract;

g) Order that Defendant pay all compensatory damages as a result of its breach of contract;

h) Order that Defendant pay punitive damages as a result of its breach of contract;

i) Order that Defendant pay interest on the monies wrongfully obtained from the date of nonpayment through the date of entry of judgement in this action;

j) Order Defendant to identify victims and amounts of unpaid royalties of its breach of contract;

k) Disgorgement of all proceeds unjustly flowing from Defendants' actions and/or omissions;

l) Award attorneys' fees, expenses, and recoverable costs reasonably incurred in connection with the commencement and prosecution of this action; and

m) Grant all other relief as the Court deems necessary and proper.

## VIII.   JURY DEMAND

Plaintiff and members of the Class and Subclasses respectfully demand a trial by jury on all issues so triable.

18

Dated:  March 28, 2016                    Respectfully submitted,


                                          THE PLAINTIFFS
                                          By /s/ Brenden P. Leydon
                                          Brenden P. Leydon, Esq.
                                          TOOHER WOCL & LEYDON, L.L.C.
                                          80 Fourth Street
 Dated:  April 6, 2016                    Stamford, CT 06905
                                          Phone: (203) 324-6164
                                          Fax: (203) 324-1407
                                          Email: BLeydon@tooherwocol.com
                                          Federal Bar No.: CT16026



                                          _____
Pro hac motion pending for                KRISLOV & ASSOCIATES, LTD.
                                          Clinton A. Krislov (clint@krislovlaw.com)
                                          Matthew T. Peterson (matthew@krislovlaw.com)
                                          20 N. Wacker Dr.
                                          Suite 1300
                                          Chicago, Illinois   60606
                                          Tel.:   (312) 606-0500
                                          Fax.:   (312) 606-0207



                                          *Counsel for Plaintiffs*